This case is number 09-1576, Finjan Incorporated against Secure Computing Corporation and others. Mr. Healy. Yes, Your Honor. Please, as the court, my name is David Healy. I represent Secure Computing, the appellate. I'd like to use the time today to talk about two of the glaring errors that arise in this case. The first one is that it is an undisputed fact. Both sides agree that approximately one-half of the sales of the main product at issue, a product called WebWasher, which had eight separately sold modules, approximately one-half of those sales did not include the accused software. In that, that accused software, while code was literally present, it was not enabled, it was never purchased or paid for by the user, it was locked, and as far as the user was concerned, it was as if it did not exist. Mr. Healy, let me ask you a question here about the locking issue. I can understand an argument based on allegations of infringement of method claims when it comes to software that's locked, because if it's locked, then the steps cannot be performed. I can understand that argument. But with respect to the computer-readable storage medium claims and the system claims, the apparatus claims, the software is present on the devices that were manufactured, correct? It is literally present, but because it is not. So those devices, the medium or the systems, were made? No, sir. They were not made? They were not, because since the software could not be used, there was no system. And if you read the actual claim language and the language of the computer-storable medium claims, which is claim 65 of the 194 patent and claim 18 of the 780 patent, those claims all use active verbs in describing the software. And if you read the testimony of Dr. Vigna... But is the software contained on the medium? It is literally present, yes, but it is not usable. And how did it get there? It was placed on there in the same way as Southwest Software versus Harlequin. So it was... The software was present. So it was made. I mean, infringement is making, using, selling, etc. So the making prong was curiously absent in any of the arguments here, and I'm trying to figure out why. Well, partly, and I can't say why completely because none of us were at the trial, I believe, but the bottom line is WebWash was a German company, and it could have had something to do with where it was being made. It might have been Germany. I don't know. But the second question or aspect to this, Your Honor, was squarely addressed in the Southwest case. And in that case, on appeal, this court addressed claim 1 of the 257 patent, which was a method claim. The district court had granted J-MAL of non-infringement on the apparatus claim, the claim 11, I believe, of the 257 patent. And because it was a very complex issue of first impression involving a certificate of correction and its impact of validity and that the district court did not give a written opinion with its J-MAL, this court remanded for further proceedings, and there was also an issue as to whether the software could be usable for performing a mapping element. Here, in contrast, it is absolutely undisputed that where the customer did not buy that software, did not unlock it, did not enable it, it was not usable. It was as if it wasn't there. And where you can see the difference between an argument that, well, just making something that exists infringes a patent, is if you look at Dr. Vigna's testimony in the appendix, and I can point you to it specifically, for the 194 patent, it said the appendix starting about page 261, and for the 780 patent, it said the appendix starting about page 702, for the computer-readable medium claims, you'll see that how this worked was they set up an important demonstration of the system, a mini-internet, and they went through all of the method claims first, and in fact, they labeled the elements A, B, C, and D, and they went through and they showed the jury, and you'll see the comments in the record, everybody stand up and look and make sure you can see it, and explained to the jury how the method worked, and by the time, after a very long testimony, she got to claim 65, said, yeah, that's just the code that executes this system, this method that I've just demonstrated for everybody, and with the 780 patent, you see that about the same thing happens, and we're talking in terms from the expert of, well, that's just, you know, you got to have code to do this, and it's got to be somewhere, and that's where the executable code is. There's no point, no point, no usefulness, no public policy served by telling people that software that's never made available to anyone for their use is a patent infringement that they ought to pay 18% royalty on, which brings us to the second error, and the second error is that Mr. Parr, the damages expert, ignored or did not satisfy the Lucid test, and specifically what I'm referring to there is the issue of apportionment. Mr. Parr was specifically asked, and because of the way he testified, you can see how the damages questions were submitted. What happens if you infringe only this claim? What happens if you infringe this claim? What happens if you infringe that claim? And he said, it doesn't matter. If you infringe one claim, they can't make or sell the product, it's off the market, and so the same royalty applies to everything. That's not what LUCID stands for. LUCID stands for the opposite. LUCID stands for the proposition that the patent owner is to get the value of his contribution to the product or his contribution that he would have gotten in the negotiation. It stands for the proposition of apportionment. Did you present this argument to the jury? The argument was presented, and I believe, if you will look at, the jury was instructed at appendix page 121 on Georgia Pacific extent of use, and I believe that Mr. Parr's no apportionment issue came up at appendix page 789, and that he said he didn't know whether you could turn the feature on or off. That was appendix page 795 at 795 page 670, and in fact, exhibit three of his report, which the court asked for Friday, shows that for the wet-washer product, there's no distinction made as to whether... I'm trying to understand if you're telling us that there was no contrary evidence presented on your behalf. There was contrary evidence presented, but it was undisputed by the parties that in approximately half the sales, and it was undisputed on Peel, that in approximately half the sales, the proactive feature was not enabled. But that's for the web. Excuse me? Only for the web, though. Yes, which was 50 of the 56 million or so in sales, so that's... More than 50%. But was that really only for the method patents, method claims? What about the system claims? System claims under 780 and the 822. Your Honor, the way Mr. Barr put it is he had no knowledge of the technology. He simply lumped it all together, called it proactive scanning, and said these three patents are proactive scanning. And he didn't try to separately value them. The 822, for instance, deals with a sandboxing technique, while the 194 deals with what I guess is more the concept of actually proactively scanning. And he made no distinction among the patents, no distinction among the claims. His thought was simply you violate one, you can't sell your product, you're out of the market, you pay on everything. Now, he did not appear to know himself whether or not the proactive scanning was in all the modules. But at trial, our expert, Mr. Deegan, did testify that as to the web washer, the modules were sold separately and that the proactive scanning was in three of the modules. As to the CyberGuard TSP, no one ever bought proactive scanning. No one bought it. And so what he said was, well, there had to be some benefit. Since I'm the damages expert, I have to assume the patent is valid and infringed, and I've got to give a damage number for this. So I'm going to assume there was some benefit to be able to advertise that proactive scanning was available. And so he put in a 1% royalty. Where Mr. Parr violated Lucent and its rule on apportionment quite clearly, is he said it's 18% on every sale of web washer, all web washer revenue, regardless of which claim you infringe, regardless of which patent, regardless of how many claims, regardless of how many patents, because it blocks the sale. And that's not what Lucent's about. Lucent is about apportionment. So since I don't have a lot of time, I'll... All right, thank you. We'll save you rebuttal time, Mr. Healy. Mr. Joseph. Good morning. May it please the Court. I suppose I'll start with infringement and then turn to apportionment and the cross-appeal issue. On infringement, Judge Lind, if you looked at page 17 of our brief, we did it too briefly. We jumped too quickly into their argument. On page 17 of our brief, we did lay out the evidence that they clearly made the products because they made the accused products and they made the keys. They clearly offered them for sale because they offered for sale the accused products and the keys. Is there any question about whether the manufacturing took place outside the United States? No, that's an issue that's not on appeal. They had... I mean, the answer's no in terms of anything that went to the jury. And this is now a... Secure's doing it here. There was a question at trial as to whether some of the sales were foreign sales that were therefore excluded. In their opening brief on appeal, they dropped a footnote acknowledging they were not raising that on appeal because it was a factual question that was disputed. And so for our view, they made offer for sale sold. That should be the end of liability. But even beyond that, in terms of the locked key issue, I think, again, it's a point that Judge Lind made, that when we're talking about the product claims here, the system claims, the computer-readable media claims, infringement just looks to whether the claim limitations are present in the accused products. But we're also talking about method claims. Yeah. On method, we have a more limited theory of liability, which is why we're not emphasizing the method claims. So you're emphasizing the system. The system and the computer-readable media. What about the 194 patent itself? Right. The 194 patent contains all three of those types of claims. And each of the patents we have, on the 194 and the second patent, we have both computer-readable media and system claims. And then on the 820, we also have systems. We have product claims in all the patents. And if you just look to the language of the claims, for 194, for example, if you look to the product claim, the computer-readable media claim, claim 65 is the independent one. And if you're interested, this is on page 271 of the appendix. What it refers to in relevant part is a storage medium storing program code for causing a server to perform certain steps. So the code just has to be stored. It doesn't have to be unlocked or turned on or anything else. But if it's just sitting there doing nothing at all and not being used by anyone, is that still? Well, in the language of the claim... In the system. Well, this is the computer-readable media claim. In the language of the claim, it is still code for causing a server to do certain things. When many products are made or sold, they aren't turned on. I mean, oftentimes you have to plug it in, turn it on, and activate it. But if it is there, here, if it is stored, that then satisfies the product claim. I agree method would be different. For the system claims, and this is on page 260 of the appendix, 32 is the independent system claim for this particular patent. It refers in relevant part to a system that has a security policy, yes, an interface, yes, then a comparator for comparing certain things, and a logical engine for preventing execution of the downloadables. Those are all there, whether they're turned on, plugged in, activated, unlocked. They're all there. And the only contrary argument they've made is they took some testimony from an expert who testified that an engine is something that has an active step to perform. And they say, well, that requires active steps. But the fact that an engine, when it's being used, has an active step to perform does not mean that the engine, as part of a product claim, has to be turned on at the time the product is made or offered for sale or sold. Or that it doesn't exist if it's not turned on. Or that it doesn't exist if it's not turned on. Right. It clearly exists. It's clearly there. Just like if a car with an engine infringed a valid patent on a car with an engine, the engine wouldn't have to be turned on for there to be liability for a product claim. It's the same point here. Which is why their infringement position boils down. One, there's the point you made about they clearly made an offer for sale regardless. But then even if you accepted their key point, their key point then, because of the language claims, does boil down to the proposition that there can never be infringement as a matter of law whenever a relevant component of a product claim is under lock. And that's clearly not the law. Because infringement turns on claim limitations. It doesn't turn on broad, categorical, policy-based generalities. And that's important to the operation of the patent system. Because the claim language is what tells PTO what it's being asked to approve and what it's approving. It's what tells the public what it's excluded from. And it's what tells everyone the baseline for validity. So there's just no warrant to import some categorical bright-line rule into what should be a very straightforward infringement process. Mr. Joseph, before we run out of time again, there's an issue in my judgment regarding the plain meaning of address to a client. That was never really defined by the district court. The district court did two things on address to a client. The district court adopted the plain and ordinary meaning. What is that? Also did. In our view, address to a client means sent to a client. What is that? It was never really defined by anyone. It was just left hanging like an appendage. Well, no, it was not. Because there was one dispute. We agree that district courts have to resolve the disputes that are presented to them. Secure brought one very specific dispute to the district court. It said, we think address to a client means sent to a client computer's IP address. And in the Barclay order, the district court dropped footnote one, rejecting that construction as being unduly narrow. Address to a client doesn't mean addressing by one specific way, an IP address. There are lots of ways to address to a client, and the path is not limited to that one specific one. So the district court did what it's supposed to do, which is resolve the parties to the single dispute that was actually presented to it. And it then adopted the terms plain and ordinary meaning. What was the plain and ordinary meaning that was given to the jury? Our expert essentially testified that address to a client means sent to a client. And their expert, they complained that their expert was not allowed to testify on this. Their expert made very clear in the offer proof of trial, his witness report, and his deposition that he was going to testify that address to a client meant including the client computer's IP address. Well, separate and apart from what the experts contended that the term meant, what did the court interpret it to mean? The court interpreted it to have its plain and ordinary meaning. And the court... Which was what? As our expert testified, undisputedly, it's basically sent to a client. It's not a fancy term. Again, you're returning to your expert's testimony. I'm looking for the district court's determination. Well, district courts are entitled to adopt plain and ordinary meaning, which is what the court did here, as long as a specific dispute is not presented to it. And here there was one specific dispute, which is whether address to a client had the very narrow meaning of containing an IP address, an internet protocol address. Clearly the court rejected that. The court rejected that. So it rejected the only dispute presented to it and then said plain and ordinary meaning. But what were the instructions of the jury? That undefined terms, including this one, take the plain and ordinary meaning. Was the plain and ordinary meaning ever defined for the jury? No. The jury defined it itself. Right. Yes. So that's a legal determination, isn't it? Well, no, because this court's decision in O2 micro makes clear the courts are entitled to adopt terms plain and ordinary meanings because, I mean, you could spend a year defining all the terms in this patent. Well, in O2 micro, I think probably if we follow O2 micro, it probably rules against you, doesn't it? No, because O2 micro says you can adopt plain and ordinary meaning. In fact, I'll potentially have to. Advising the jury as to what the plain and ordinary meaning is because that's a legal determination for the judge and not for the jury. I think the whole point of adopting a plain, of just saying it's a plain and ordinary meaning is that the court's not doing a claim construction because courts can't independently claim, independently interpret numerous claims that are full through these patents. But they did resolve, the key point is the court did resolve the one specific dispute presented to it. And then at trial, their expert wanted to testify to the exact claim construction that the district court had rejected. And so the only reason that the trial court did not let that expert testify at this point was that the offer of proof at trial and then the expert's report and deposition made clear he was going to rely on the rejected claim construction. And even so, their expert was entitled to testify, was permitted to testify to the extent his testimony was not going to be square on contrary to the rejected claim construction. But there was no claim construction. Well, there was a claim construction that it was not the only claim construction they wanted. And then having rejected their position, which was, you know, they never came up with a plan B. They had a plan A that it had to be an IP address. That was their theory. And when the court rejected that, they didn't have a plan B for trial. Their offer of proof made that clear. And therefore, it went to the jury on the plain and ordinary meaning. And what was the resolution by the court at that point? Doesn't O2 micro require that when the parties raise an actual dispute regarding the proper scope of the claims, the court, not the jury, must resolve that dispute? Right. How was that dispute resolved by the court? It was resolved against them by rejecting their construction and saying that everyone agreed there was a plain and ordinary meaning, but then there was a dispute as to whether the plain and ordinary meaning referred to an IP address. So the court said there's a dispute as to an IP address. I'll resolve that. There's a plain and ordinary meaning. It just means addressed to a client just means sent to a client. And although I'm now boring into the merits of the claim construction, which are not before you because they haven't raised that on appeal, it's also important to understand that addressed to a client necessarily has a limited role in these claims because the whole point of the security system here is that incoming messages do not go to the client. They go to a security system, which can do the security screening, and then either forward or not the message to the client. So addressed to a client is not something that can have a hyper-technical meaning here because that would be inconsistent with the way the pattern would operate. But wouldn't that be reversible legal error if the judge did send it to the jury for determination of the meaning of that particular term in the claim? If he had let a dispute as to the meaning of that term, a legal dispute, be resolved by a jury, that would be a problem. But here the only dispute was whether their narrow interpretation prevailed, and the court did resolve that dispute. And beyond that, he let their expert testify to the extent that their expert testimony is not dead on contrary to his actual claim construction. Now on the damages issues, I suppose if I could start quickly with our cross-appeal because I think it's pretty straightforward and time's ticking down. The district court, in one respect, was just refusing to award any reasonable royalty at all for the 17 months of continued willful infringement between the entry of the verdict and the entry of the permanent injunction. Does the judge have discretion as to whether to award post-judgment damages? The court certainly has discretion as to the amount of damages, but by statute it's required to award some reasonable royalty for that period of infringement. Post-judgment? Yeah, well, in the ECHOLAB case, this court remanded in part for the district court to do exactly that. And there are other cases where the court has affirmed that. Yeah, but my question is whether that's a matter of discretion or whether that's mandatory. Right. I think ECHOLAB, along with the patent statute saying shall award a reasonable royalty, indicate that it's mandatory. The shall award reasonable royalty doesn't answer the question of post-judgment. Right, well, the problem is we've got the situation where the jury can award considered damages up to the verdict. Once the court enters a permanent injunction, then we can go by way of contempt, which, by the way, we are. That's bestayed. But then there's this interval for however long the district court takes to resolve a permanent injunction. It's out of our hands. It's an arbitrary period of time. Here, it's 17 months. There's no reason at all to just give them a free pass for 17 months of continued willful infringement. And here, the district court didn't give any reason for doing so. I mean, if it had any discretion, it would have to exercise it. Here, the district court didn't give any reason at all for doing so. The only thing it said was that it was rejecting their waiver argument. So on appeal, they're saying, well, the only reason they're giving to try to sustain this is that, well, the district court said we waive the right to the accounting. But the district court found the opposite. It said it rejected the waiver argument. And then proved that up because it awarded an accounting for a different period of time right before the verdict. So I suppose if you don't succeed on your cross-appeal, then you would have to file a separate lawsuit for that period. Yeah, and it would be an interesting question for the other side whether they would then say that we were required by res judicata or collateral estoppel because this period was before this court. I mean, the logical time for us to get this is before the district court that's considering up until the verdict and is now considering contempt for after the permanent injunction. There's no reason we shouldn't get it here, and the district court didn't give any. And the district court's rejection of their waiver theory is also reviewed only for abuse of discretion, especially since the district court was in by far the best position to consider local practice. And the only thing for their waiver theory that they're now trying to raise on appeal, even though the district court rejected it, they point to two non-binding district court decisions from the same district and say, well, there's a request there that those courts thought you needed to request specifically an accounting earlier on. But one of those cases did not even involve post-verdict damages. It involved the signified of the appellate pre-verdict damages. Did the district court during that period that occupied those 17 months understand that, meanwhile, there was no injunctive effect? Well, yes. The whole time, he had under advisement our motion for a permanent injunction as well as our motion for damages up until the time that he entered it. So their theory is if you waited five years to enter the permanent injunction, they got a free pass for five years of continued willful infringement. In our view, 17 months is bad enough, but in their period, it could be indefinite, which just doesn't make any sense. This is the time and place to get these damages. And if I could also turn quickly to their appeal, their main point seems to be apportionment. There are a few things that I'm running short. There are a few things I should emphasize. One is that to make clear that you understand this, the entire code is in each and every one of the infringing products. And the reason that that's important and not a technicality is that they market this as an integrated product. If you could turn to it, if there's one of the best documents, I think, is from their marketing manual, which is on page 3686 of the joint appendix. Under the heading, why do people buy WebWasher? They say that people buy WebWasher because it combines, the first point is it combines two things. Proactive scanning, which as everyone testified was the next wave of the big deal of computer security, but it's proactive scanning with multiple antivirus engines. So it's the combination of those two things together that drives demand for this integrated product. And in addition, they then explain a little bit below that people want an integrated product so that they can initially activate the functionality they think they need initially, but want to have the ability to then later activate additional functionalities without incurring the cost penalty of having to go buy a whole new system. So the point is that people were looking for an integrated product with this brand new functionality. Many of them did pay to activate this functionality promptly. Others wanted the ability to be able to add it later if they wanted without having to buy a whole new system, which is why, this is an important point, this is why everyone agreed, they marketed very heavily that proactive scanning was in this product. They called it the Fingen killer after they copied it from Fingen because this was the technology people wanted and this is how they could kill Fingen. And the other evidence that helps to show all of this is if you look at the marketing reports, this is all on the record of course, the marketing reports from an independent company called IDC said that proactive scanning was going to be needed to be competitive in the future. Our expert relied on that before the jury. The shareholders report that CyberGuard issued to its shareholders when it bought WebWasher said that it would now be able to proactively protect its customers in order to realize our goal of providing a comprehensive and integrated set of solutions. There are any number of other witness testimony and documents in the record to the same effect. So this was a crucial driver. That said though, their entire market value rule is a new argument on appeal. The entire market value doctrine was mentioned not once in the district court. And the governing legal standard under that doctrine that we had to show that the sales of the one drove the sales of the other in order to establish our royalty base was never mentioned once in the district court. And that's important because if it was, then we would have had the opportunity to put on evidence of the point. The jury whose verdict is being reviewed would have had the opportunity to consider the issue. And the district court whose denial of judgment is a matter of law would have had the opportunity to consider the issue. So while we think that there is sufficient evidence in the record, it's very important that this entire market value rule argument was not laid below. And instead, as counsel noted, I think it's an important point in our favor, the jury instruction simply told the jury that this type of consideration was one of the 15 discretionary Georgia-Pacific factors that it could consider as part of its overall analysis. So what they're now asking for is entirely inconsistent with what the jury was told. Because the jury was told, you know, you can consider this with other things. They're now saying, no, unless the jury found this specific fact, which it was never asked to find, that the entire royalty base has to be dramatically different. And that's just not the way that the case was tried in the lower courts. Mr. Joseph, I have one question regarding the Russell Parr report on damages. Yes. It's not part of the record below. His report is not part of the record below. But he testified from that report. He noted there were two exhibits in that report that he specifically testified to. There was also a presentation made to the jury on slides combining Exhibits 1 and Exhibits 2. Were you the trial counsel for that? No, but I do know the answer to your question. You're familiar with the slides? They're not part of the record. Are they part of the record below or not? No, this was, what happened with this is that, I mean, you're right that, and I'm glad you asked because we found out on Friday that the court had requested our expert report. And, obviously, we don't mind you reading our expert's report. But you're right that it's not in the record, and I wanted to make sure you knew that because it means therefore it's not really a basis for a decision. By all means, read our stuff. But what happened is, you're right, he had his report in front of him when he testified, but the report did not go on the record. Most of the exhibits did not go on the record either. There are some things he relied on when he had his exhibits, but most of them did not. The jury actually asked, as part of its deliberations, to see his expert report and exhibits. And the district court denied that request because it was not in the record. I mean, I think the way that things normally work. But there is testimony from the. . . The testimony is clearly, I mean, the testimony and the exhibits that he testified about that were put in the record are clearly in the record. And we would encourage you to, you know, rely on his testimony and find him a sufficient basis. What about the exhibits that he was relying on? We can't, that's not part of the record. Some limited portions are on the record, and therefore you can rely on the things that are on the record. But how do we know what was before the jury then at that point in time? Well, if it's not on the record, it didn't go to the jury. I mean, that's what I'm saying. The judge, when the jury asked for our expert report, the judge refused that request. So the jury didn't get our expert's report, didn't get the exhibits, because at trial we relied on the oral testimony and certain exhibits that went in, along with whatever else Secure wanted to put in in that regard. So that's, what's in the record is the testimony and the small number of exhibits. What about the slides? Were there slides presented to the jury? Yeah, the slides, I mean, I think I'm off the record here because I haven't seen the slides in the record. But they were, you know, they identified the Georgia-Pacific factors. They identified the numbers that are otherwise in the record. They were, there wasn't anything. Are they part of the record? I don't believe that they are. At least, I haven't seen those slides in the record. So there was no substance in those slides that the jury could rely upon? No, there was certainly substance in the slides, but I don't think that it's significantly different from what you've, I think it was helpful illustratively, but I don't think it was dramatically different from what you've seen. Is there any reason why the district court didn't permit the report and the slides and all of these other things to come into the record? They seemed to think that they hadn't been in the record yet and the jury was deliberating, and therefore wouldn't be supplementing what was before the jury. But how do we know if there was substantial evidence before the jury to support their finding? Well, let me walk through the substantial evidence in the record to support the finding. And one, briefly, I know I'm over time, and one important thing to remember is the jury did not just adopt our expert report. We asked for an 18% royalty on software. The jury gave us a lower 16%. The royalty base, the jury didn't accept either. For software, it gave us a lower base. For hardware, it actually gave us a higher base, which they haven't objected to because there was still evidence to support it. So what we're reviewing here is not the expert report. We're reviewing the jury's award, the jury's reasonable determination, which is different. Or looking at the substantial evidence before the jury to support their finding. And that would be, and this would be, if we're talking about the Georgia-Pacific factors, this would be the substantial evidence that was testified to, just briefly. Both parties' experts agreed that it's typical in the field and appropriate here to award a royalty based on between 25% and 33% of the operating profits. Our expert testified that it was appropriate to be at the high end of that range here for a few reasons. First, they say he didn't tie this in a bow. He did, though. Toward the end of his testimony, and this is in the appendix at page... This is in the appendix toward the end of his testimony. What he testified to, and I'm now on appendix page 788, which is transcript page 644 at the bottom, starting at line 16. He says the fact that it's a keystone of fundamental technology to the product. Without it, you don't have a viable product or you won't for long because the trend is to include proactive scanning. That's what I meant by the one-third, two-thirds split. He's relying on the fact that it's a keystone technology you have to have in order for this to actually be the finishing killer. But even before that, and again, this is appendix page 788, transcript page 644. Even before that, he had meticulously walked through each and every one of the jury and the Georgia-Pacific factors, and what that analysis showed, what that analysis showed is that of all of the relevant factors here, they all supported an award at the high end of the range, which the jury could then infer supported the conclusion that he just made that when the jury was making its determination under Georgia-Pacific, it could agree that when we looked at all those factors, they all pushed it to the high end of the range. And what were those factors that were testified to? That these were direct competitors, that it was keystone technology, the fundamental next wave of technology that you had to have to be competitive according to the embedded marketing reforms. He testified that, and the other side's expert testified too, that both parties relied on this, prominently featured this in their advertising. The fact that Secure succeeded in taking a lot of sales away from FinGen in this way. On JML, the district court's opinion explains that after Secure got this technology, its market share went up five-fold and ours went down by 66%. And when you're talking... Is that answering your question? We'll have to go to the record. So this is all the information that would explain why you're at the high end of the range, if that's what you're talking about. If you had any other substantial evidence questions about this or that, obviously I'd be very happy to answer them, but in our view, they are all very deferential standard of review questions, especially considering that the jury didn't just blindly accept everything we said. I think that we have what we need. Thank you, Mr. Joseph. Mr. Healy, and in large Mr. Healy's time by the amount we've run over, if needed. Your Honor, first in regard to the O2 issue, what happened there was it was explicitly brought up at the claim construction hearing that while the parties had originally thought that this term addressed to the client, which is in every claim of the 194 patent, was something that could be agreed on as plain or in meaning, that there was in fact a dispute over what that meaning was. And first Mr. Andre acted for Finjan, previewed it, and then there was a response, a brief response from Secure's attorney, who pointed out that in describing the invention to the European Patent Office, they had given a particular meaning to this term addressed to the client, and that the premise that Secure was going on was that they would follow the meaning that the European lawyer representative had, and now there was this dispute because their expert and their trial counsel were using a different meaning than what the European counsel had used. In the claim construction order, pages one and two of that order, the district court only says we're giving it the plain or ordinary meaning. In footnote one, it refers to Phillips and says, well, I don't have to construe everything. And then after that site it says, and I think that the meaning being proposed by Secure is unnecessarily narrow, but he never gives a definition. In other words, at most he says, I don't like what Secure is saying, even though he never really heard the dispute, the claim construction hearing, because it's not directly from the spec, but he never says what the term does mean. Was there an alternative meeting proposed by Finjen? I believe that if you look at the appendix and specifically at the claim construction hearing on the appendix, that argument got kind of cut short, and what Finjen said was that they had no proposed definition that it had a plain or ordinary meaning in the industry. And we said for Secure, well, your lawyer characterized the plain or ordinary meaning in filings in Europe,  and the judge never made any analysis. He never tried to come up with a definition. He just said, I think what Secure is saying is too narrow. And he never said, well, where does it fall between or that Finjen's was right. He just said that Secure's is too narrow in the second sentence of the footnote. And then there is nothing in the jury charge on address to a client. And then this was, of course, again raised in the J-Mall. So was the dispute then as between the plain ordinary meaning versus the meaning asserted in the European proceeding? And the district court then says, well, I don't buy the European definition, so the plain ordinary meaning controls. No, what happened was, I believe from reading, and I think this is at the appendix pages starting around page 347, after this issue is previewed by Finjen's counsel, Secure's counsel starts explaining their position and ultimately explains this issue about how the European proceedings, Finjen's lawyer had explained the term in a different way. And the district court never gives a definition. He never says Finjen's right. He never says that the IP address issue that we were raising was wrong. He just says in one sentence in the first footnote, the second sentence of the first footnote, well, I don't think Secure's effort to narrow it is proper. But he doesn't say what it is. And what happened was Dr. Vigna, their expert, testified at length about what the plain ordinary meaning was and gave an analogy about passing a note starting with one kid in the classroom and passing it around the classroom until it got to another kid. And our expert was not allowed to testify contrary to that. So you had a disputed definition. You had at best an offhanded remark at the end of a footnote that said, Secure, you're being too narrow. No definition is given in the jury charge. Their expert testifies at length about it. And, in effect, it's a classic O2 problem. The judge is saying, I don't think it's as narrow as Secure's trying to make it down to me, but I'm not going to define it. And he lets their expert instead define it. And that's an O2 issue. I would also like to address a couple of the other points before I run out of time. And that is, for example, if you look throughout Dr. Vigna's testimony in the appendix and how he describes the invention and how he describes the system and how the system works and how he describes the computer-readable medium, and if you look at the fact that those system claims and that medium claim all use active verbs, it's a system for doing this. It's a system for doing that. And that belies any argument that, well, the fact that the code is there, not usable by anyone, invisible to the buyer, is contrary to how their expert explains to the jury this all works, and it's contrary to the claim language of the patents. Finally, what I'd like to say is that Mr. Parr was handed his report first thing when he started to testify because apparently he needed his report in his hands to testify to keep it all straight. But he ignored not only the Lucent apportionment rule, but he testified in the appendix, page 786, and again appendix, page 795. He had no idea whether this feature of proactive scanning was on or off or what modules it was in or not in. He assumed it was in every module. He assumed it was always on. That was the premise of his damages report because you wouldn't hear the 16% or 18% regardless of whether someone was going to use it or not, and I think that the premise that we're hearing now is an after-the-fact explanation. Well, this way people knew they could turn it on any time. Was there a request made for his examiner, his expert report, to be introduced in the trial? No. His counsel handed him his expert report without objection when he first took the stand so that he could testify from it. And then his expert report doesn't address this issue that WebWasher is sold as eight separate modules, some with the feature, some without, and approximately half the sales are without. But did Secure request that the expert report be made up record so that it could be challenged? No. Secure challenged him on cross-examination in the appendix around pages 780 to 797. Now, let's see, we're over time. Do you want to take a moment to respond on the cross-appeal or stand on your brief on that? We'll stand on our brief on cross-appeal. We believe that Chief Judge Sleede applied the Delaware rule. Okay. All right. In that case, there's no need for a rebuttal on the cross-appeal. The case is taken under submission. Thank you, Mr. Healy and Mr. Joseph.